BENJAMIN v. DRAFTS.

1. ORDER OF SALE PENDING REFERENCE.—A Circuit Judge has the power to pass a decree of sale in a foreclosure action, pending a reference of the cause, and such power is not affected by the fact that the order of reference was granted by the Supreme Court in remanding the case.

2. IBID.—ISSUES.—Where reference is pending for the determination of issues raised by the defendants among themselves, it is not error to order a sale

of the land involved, under plaintiff's undisputed mortgage; and issues as to plaintiff's mortgage raised by the answer of the mortgagor defendant cannot be considered as still existing, where the record shows that they were not insisted upon, and the case was conducted as if they had been abandoned.

3. IBID.—ACQUIESCENCE.—A consent to the postponement of a sale ordered by a decree of court, seems to imply a recognition of the validity of such decree.

4. REFERENCE—TERMINATION—STATUTE.—Doubted whether a reference is pending, where one of the parties gave notice in writing more than sixty days after the action was finally submitted, that he elected to end the reference at the expiration of twenty days from the service of the notice. Does a statute as to the termination of a delayed reference affect references then pending?

5. FINDINGS OF FACT.—The evidence will be most closely examined, where referee and Circuit Judge differ in their findings of fact from conflicting testimony, the latter being regarded as *prima facie* right in his conclusions.

6. IBID.—BURDEN OF PROOF.—Where defendant admits the execution of the note and mortgage sued on, but assails their validity on the ground that they were obtained by duress and undue influence, the burden of proof is on the defendant to establish her plea in avoidance; and this is especially so where this defendant, in a former action between herself and another party, and her witnesses there, the same as her witnesses here, established by their testimony the validity of the mortgage now assailed by them.

7. FINDINGS OF FACT—DURESS.—This court, concurring with the Circuit Judge in reversing the referee, found as a fact from the testimony in the case, that the mortgage sued on was not obtained by duress and undue influence, as alleged by the mortgagor, who for many years had never questioned its validity, and had testified in court in its favor.

Before BENET, J., Lexington, September, 1894.

Action by Harriet I. Benjamin against Sarah Drafts, Polly C. Meetze, and W. J. Assmann.

*Mr. G. T. Graham,* for appellant.

*Messrs. Meetze & Muller, Melton & Melton,* and *C. M. Efird,* contra.

July 20, 1895.   The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   This action was commenced on the 20th January, 1888, by the plaintiff to foreclose a mort-

gage of real estate, executed by the appellant, Sarah Drafts, on the first day of January, 1886, to Messrs. Meetze & Muller to secure the payment to them of the sum of $500, for a fee for professional services rendered by them to the said appellant, which mortgage, it is alleged, was duly assigned to the plaintiff before the commencement of this action. It is also alleged in the complaint that the defendant, Polly C. Meetze, holds a mortgage, prior in date to that held by the plaintiff, covering the same premises, but that the said Polly C. Meetze has, by her writing, endorsed on plaintiff's mortgage, consented to waive her prior lien in favor of plaintiff, on account of the fact, as recited in said endorsement, that the amount for which the plaintiff's mortgage was given was for services rendered by Messrs. Meetze & Muller ''to the within mortgagor in recovering the land within described, and without which recovery my mortgage would have been worthless.'' It is also alleged in the complaint that the defendant, W. J. Assmann, has some interest in the mortgage to Polly C. Meetze, which, it appears from the testimony, arose from the fact that said Assmann had advanced about three hundred dollars to Polly C. Meetze, to enable her to take back the mortgage which she had previously assigned to one Ballentine, and to secure the repayment of the amount so advanced, said Assmann took from Polly C. Meetze an assignment of so much of the mortgage as would be sufficient to secure the repayment of the sum advanced.

The answer of the appellant, Sarah Drafts, admits the execution of both of the mortgages above referred to, but she denies the assignment of the first mentioned mortgage to the plaintiff, and alleges that nothing is due thereon; and as to the mortgage to the defendant, Polly C. Meetze, she sets up as defence thereto that said mortgage was without consideration, was given to defeat, delay, and hinder her creditors, and that the same was obtained from her by the said Polly C. Meetze and her husband, Walter S. Meetze, by the exercise of duress, imposition, and undue influence. Polly C. Meetze answered, joining in plaintiff's prayer for foreclosure, and utterly denying all charges made by appellant against her mortgage. Wm. J. Assmann

answers pretty much to the same effect, and, in addition thereto, avers that when he took the assignment of so much of the Polly C. Meetze's mortgage as would be necessary to secure the repayment of the amount advanced as above stated, he had no knowledge or notice of any kind of any defect or vice in said mortgage.

After the pleadings were made up, the defendant, Sarah Drafts, applied to his honor, Judge Hudson, for an order, framing certain issues of fact to be tried by a jury. This order was refused, and an order was granted by Judge Hudson referring all the issues, both of law and fact, to Robert W. Shand, Esq., for trial. From that order the said Sarah Drafts appealed, and while the case was pending in the Supreme Court, an order was granted by that court, with the consent of all parties, substituting J. Brooks Wingard, Esq., in place of R. W. Shand, "to hear and determine the issues in said action," and affirming the order appealed from in all other respects. This order, as set out in the "Case," is without date, but it is said to have been passed on the 11th of January, 1889. At all events, it appears from the "Case" that the first reference, before Mr. Wingard, was commenced on the 20th of August, 1889. Many references were subsequently held, and an immense mass of testimony was taken, and on the 26th day of July, 1894, the referee submitted his report (a copy of which should be incorporated in the report of this case),[1] in which he substantially finds that the Polly C. Meetze mortgage was obtained by the exercise of duress, oppression, imposition, and improper and undue influence upon the said Sarah Drafts by the said Polly C. Meetze and her husband; "that the defendant, Wm. J. Assmann, having purchased an interest in said mortgage after its maturity, can occupy no higher position than the original mortgagee;" and he also finds that the interest claimed by the Carolina National Bank, who, in some way not fully explained, became a party to the action, "was purchased after the filing of the pleadings in this action, must stand or fall only as the mortgage itself is sustained or defeated." He, therefore, rec-

---

[1] The Reporter was not furnished with a copy of the "Case." It was typewritten, and the number required by the rules were not filed.

28—44

ommends that the notes and mortgages given by Sarah Drafts to Polly C. Meetze be delivered up and cancelled. It is well to note here that the referee, after stating what he regards as the substance of the pleadings, uses these words: "The sole issues raised by the answers herein are confined to the defendants; and, briefly stated, it is as to whether duress, imposition, oppression, and undue and improper influence were exercised upon the defendant, Sarah Drafts, by Polly C. Meetze and her husband, Walter S. Meetze, in compelling the said Sarah Drafts to execute and deliver (to) the said Polly C. Meetze the notes and mortgages to secure the sum mentioned and described in the pleadings herein."

To this report the defendants, Polly C. Meetze and Wm. J. Assmann, as well as the Carolina National Bank, filed exceptions, and the case came on for hearing, upon the report and exceptions, before his honor, Judge Benet, who rendered his decree (a copy of which should be embraced in the report of this case) overruling the report of the referee, sustaining the notes and mortgage to Polly C. Meetze, and directing that after the payment of the costs and expenses of this action, and the amount due on the mortgage held by the plaintiff, the balance of the proceeds of the sale of the mortgaged premises be applied: *first*, to the payment of the claim of Wm. J. Assmann; *second*, to the claim of the Carolina National Bank; *third*, to the notes and mortgage of Sarah Drafts to Polly C. Meetze; and that any balance that may then remain be held subject to the further order of the court. From this decree the defendant, Sarah Drafts, has given notice of appeal upon the several exceptions set forth in the record, which need not be repeated here, as in our view of the case it turns upon a single question of fact, which will be presently stated.

It seems, however, that when the referee made his report, the plaintiff applied to his honor, Judge Fraser, for a decree of foreclosure, which was granted on the 27th day of February, 1894, and the mortgaged premises ordered to be sold on the first Monday in November, 1894; but by an agreement of all parties the sale was postponed until the first Monday in December, 1894, though, in fact, the property was not offered for sale

until the first Monday in January, 1895, a day or two before the filing of Judge Benet's decree. From this decree of Judge Fraser the defendant, Sarah Drafts, has also appealed upon the following ground: "For that his honor erred in ordering a foreclosure of the plaintiff's mortgage, and directing the clerk of the court of Lexington County to sell the lands and premises mentioned and described in the complaint herein, on the first Monday in November, 1893, or some subsequent saleday thereafter, because all the issues raised by the pleadings in this case were, on the 4th day of January, 1889, referred to J. Brooks Wingard, Esq., special referee, to hear and determine, by an order of the Supreme Court of South Carolina, at the time of filing of the order of Judge Fraser, to wit: on the 27th day of February, 1894, the taking of the testimony by the referee had not been concluded, and no report had been filed by said referee, nor had any order been passed requiring said referee to file his report therein on or before a certain day; and it is respectfully submitted that his honor, Judge Fraser, was without jurisdiction in passing said order of foreclosure as to plaintiff's mortgage, and in ordering a sale of the land and premises aforesaid at the time aforesaid, and he erred as matter of law therein."

We propose first to consider the exception to Judge Fraser's decree; and we might dispose of it very speedily by the simple observation that it is based upon the ground of lack of jurisdiction, which is clearly untenable; for if a judge has no jurisdiction to pass an order to speed a cause pending in the Court of Common Pleas, over which he presides, it would be difficult to conceive what tribunals would have such jurisdiction. The fact that the original order of reference was granted by the Supreme Court is not sufficient to deprive the Circuit Court of jurisdiction, for by the express terms of the order the case was necessarily remanded to the Circuit Court, and thus the Supreme Court lost its jurisdiction. But we are disposed to take a more liberal view of this exception, and to inquire whether there was *any* error of law in the decree of Judge Fraser. Even if it should be conceded that the reference was still pending when Judge Fraser rendered his decree, we do not think there was any error in his

decree, for it is manifest, from the whole proceedings in the cause, that there was no issue between the defendant, Sarah Drafts, and the plaintiff, as to her right to foreclosure, upon which the referee was called upon to pass, but that the whole issue was between the defendant, Sarah Drafts, on the one side, and the defendants, Polly C. Meetze and Wm. J. Assmann, on the other, as to the validity of the Polly C. Meetze mortgage. In that issue the plaintiff had no concern whatever, and in whatever way such issue might be decided, the plaintiff's right to foreclose could not possibly be affected. It must strike every one as manifestly unjust to the plaintiff that she should be postponed in her rights, to await the determination of an issue in which she had no concern. Such a course of proceeding is pointedly rebuked by this court, in *Canaday* v. *Boliver*, 25 S. C., 547; and as Judge Fraser well says in his decree: "It seems that these matters in dispute (between the defendants) have been for years under reference, and that while the plaintiff has been using all efforts to have the same concluded it has not yet been done. The court can perceive no reason why the plaintiff shall any longer be deprived of her order for foreclosure."

But it may be said that the defendant did, by her answer, raise two issues with the plaintiff: 1st. As to the assignment of the mortgage to her. 2d. As to whether there was anything due thereon. It is manifest, however, that these issues were abandoned at the very outset of the case, and were never afterwards pressed, and no testimony was adduced before the referee to sustain any such contention on the part of the appellant. This is apparent from the statement made in the "Case" that the appellant claimed, and her claim was allowed, that she had the right to open and reply, because the real issue was between the defendants. Accordingly, the referee says in his report that "the sole issue raised by the answer herein is confined to the defendants"—that is, whether Polly C. Meetze's mortgage was obtained by duress, &c., and to that issue alone was the testimony before the referee confined. It is clear, therefore, that Judge Fraser was fully justified in saying: "The contention in the whole case is between the defendants; there is no pretense of any objection to the validity of the claim of the

plaintiff—in fact, all of the defendants except Mrs. Drafts join in the prayer for the foreclosure of the plaintiff's mortgage, while Mrs. Drafts admits its validity." In addition to this, it appears in the "Case" that, on the 3d of November, 1894, the attorney for appellant agreed in writing with the attorneys for the other parties, to a postponement of the sale, as ordered by Judge Fraser, until the first Monday in December, 1894, without any protest or exception to such order of sale, which seems to imply a recognition of the legality of the order.

But again, it is at least doubtful whether the reference was legally pending when Judge Fraser made his decree, for it appears in the "Case," that on the 5th day of May, 1893, the attorney for appellant was served with a notice in writing that the reference must be closed on the 25th of May, 1893. Now the Code, in section 295, provides that "The referee or referees shall make and deliver a report within sixty days from the time the action shall be finally submitted; and in default thereof, and before the report is delivered, either party may serve a notice upon the opposite party that he elects to end the reference; and thereupon the action shall proceed as though no reference had been ordered." The amendment to this clause by the act of 1893 (21 Stat., 399), even if it applies to this case, does not affect the view above presented; for, by that amendment, provision is made for an extension of the time "by mutual consent in writing," and no such consent appears in this case. In any view of the matter we are unable to discover any error in the decree of Judge Fraser, and hence the exception thereto must be overruled.

We come next to the exceptions to Judge Benet's decree, which, in our judgment, raise the single question, whether the appellant has shown that the notes and mortgage held by Polly C. Meetze against Sarah Drafts, were obtained by duress, imposition or undue influence. This is a question of fact pure and simple, and under the well settled rule it is incumbent upon the appellant to show that the conclusion reached by the Circuit Judge is without any testimony to sustain it, or is manifestly against the weight of the evidence.

It is true that the referee and the Circuit Judge differ in the view which they have taken of this question of fact, but the only effect of that is to induce this court to scrutinize the testimony more closely than it would otherwise be deemed necessary to do, and to judge for itself who has reached the correct conclusion—remembering, however, as was held in *Maner* v. *Wilson*, 16 S. C., 469, that where the referee and the Circuit Judge differ as to their conclusions on a question of fact, in a chancery case, upon which there is a conflict of testimony, the latter must be regarded as *prima facie* right. This is based upon the theory that the Circuit Judge, from his position and experience in dealing with such matters, is better qualified to sift conflicting testimony than any referee could be. We have, therefore, examined the voluminous testimony in this case with great care and at an expenditure of much time, which perhaps might have been more profitably otherwise employed, and we must unhesitatingly say that we are entirely satisfied that the Circuit Judge was right in the conclusion which he has reached. While it is not usual, and would scarcely be profitable, to enter into any elaborate examination of the testimony to vindicate the correctness of the judge's conclusion, we do propose to indicate some of the more striking points in the case which have attracted our attention.

There is one circumstance at the outset which seems to have escaped the attention of the referee, or at least to which he gives no prominence, and that is that the burden of proof rests on the appellant to show that the notes and mortgage held by Polly C. Meetze were obtained by duress, imposition, and undue influence. The execution of these papers having been admitted, they are, of course, to be considered as valid until they are shown, by one who assails them, to be invalid. This is especially so in this case, when the undisputed testimony shows that these same notes and mortgage were once before assailed in the case of *Fort* v. *Drafts and Polly C. Meetze*, upon the ground that the notes were without consideration, and they as well as the mortgage were given to delay, hinder, and defeat the creditors of the appellant, Sarah Drafts, in which case these papers were by the solemn judgment of the court determined

to be good and valid, which judgment was based upon the testimony of the same witnesses who are now mainly relied upon to show that they were obtained by duress. It is true, that in the former case, instituted by Fort, no charge of duress was made, and no testimony to that effect seems to have been introduced; yet if it be true, as the appellant *now* claims, that these notes and mortgage were obtained from the appellant by duress, exercised by Polly C. Meetze and her husband towards the appellant, Sarah Drafts, that was *then* certainly known to her and to her main witnesses—Mrs. Speights, her daughter, and to her brother, Jefferson Leaphart—and would have furnished ample ground for the overthrow of said notes and mortgage. While, therefore, for this as well as other reasons, needless to be mentioned, the question now presented may not possibly be regarded as *res adjudicata*, by the judgment rendered in the former case instituted by Fort, yet the facts developed in the former case reflect much light upon the inquiry now presented.

The counsel for appellant feeling the force of this, to avoid its effect, has undertaken to show, not only that the notes executed by Sarah Drafts to Polly C. Meetze, as well as the mortgage to secure the payment of the same, were originally obtained by duress, but that such duress was continued through a period of several years, to such an extent as to force, not only Mrs. Drafts, but her daughter, Mrs. Speights, and her brother, Jefferson Leaphart, to swear falsely in the Fort case as to the validity of said notes and mortgage. This story is of such an inherently incredible character, that it would require much more testimony and of a different character than that which has been adduced in this case to command the confidence of right-minded, disinterested persons. Here is an old lady, living within six miles of the capital of the State, and about the same distance from the county seat of the county in which she resided, and thus having easy access to the officers and agencies of the law, designed for the protection of the weak and helpless against the assaults of the lawless, asks the court to believe that she was compelled by a single individual and his wife—her own daughter—not only to execute a fraudulent and sham mortgage, but also to commit

perjury in a case brought by one of her creditors to set aside such mortgage. Not only that, but such was the terror which this single individual and his wife excited, not only in her breast, but in that of her brother, a gallant confederate soldier, living with her, and her other daughter, Mrs. Speights, living in Augusta, Georgia, as to compel them all to join with her in deliberately committing perjury—the daughter, Mrs. Speights, *voluntarily* leaving her home in the city of Augusta, where she certainly was beyond the reach of danger, on more than one occasion and returning to Lexington, where she would be in easy reach of this alleged desperado, and for what purpose—to commit perjury.

But what was the nature of the duress claimed to have been exercised towards appellant and her main witnesses, over this long period of years? There is not the slightest evidence that either Walter S. Meetze or his wife ever offered or attempted any act of violence towards Mrs. Drafts, or any of her witnesses. Nothing but mere words, and they, too, of a most dubious character. Again, there is no evidence that either Polly C. Meetze or her husband, during the long period since 1881, when the mortgage was executed, ever indicated either by word or deed, any intention or even desire to enforce the mortgage against Mrs. Drafts, until the commencement of the present action, when Polly C. Meetze was made a party defendant, and was thus compelled to set up her mortgage, or abandon her claim altogether; and, as one of the counsel for respondents very pertinently says, but for the institution of the present action, for all that appears, Polly C. Meetze would never to this day have pressed her mortgage against her mother. On the contrary, as the testimony shows, whenever there was any danger of her mother being disturbed in the possession of the mortgaged premises, not only Polly C. Meetze but her husband also, always displayed not only a willingness but an anxiety that Mrs. Drafts should be secured in the possession of a home.

There is another important and pregnant circumstance in this case to which due attention has not been given, and that is, that the appellant has wholly failed to give, or even suggest, any reason whatever why the terrorism which she claims con-

tinued from the time of the execution of the mortgage to Polly
C. Meetze, not only up to the time of the trial of the Fort case,
and was so great as to compel her and her principal witnesses
to testify falsely in that case, but up to the time of the com-
mencement of the present case, should have then suddenly
ceased.   There is no doubt that Walter S. Meetze, who seems
to have been the source of terror, which appellant now relies
upon to overthrow the Polly C. Meetze mortgage, was still
alive and in possession of all his faculties, mental, moral, and
physical, and he was present certainly at one, and probably at
all, the references held in the present case, and there is no evi-
dence tending to show that he had lost any of his alleged ferocity
or had become more lamb-like and amiable.   Why, then, this
extraordinary change in the testimony of the appellant and her
main witnesses?   If she and they were so overpowered by the
fear of Walter S. Meetze, at the time of the trial of the Fort
case, as to induce them then to testify falsely, and if this fear
continued up to the time of the trial of the present case, as is
evidenced by the fact that no subsequent attack was made upon
the Polly C. Meetze mortgage until after the present action was
instituted, and, on the contrary, its validity was distinctly
recognized by Mrs. Drafts when she signed, as a witness, the
writing by which Polly C. Meetze waived the priority of the
lien of her mortgage in favor of the plaintiff's mortgage, the
inquiry naturally forces itself upon the mind, what was the
reason for this unmistakable change in the testimony?

While the appellant has failed to suggest any answer to this
very natural inquiry, we think it may, possibly, be found in a
circumstance to which we will advert.   It appears from the
testimony in the case, that the day before appellant's answer
was filed in this case, there was a secret conclave held in the
office of appellant's counsel, at which it was arranged that Mrs.
Drafts should confess a judgment for a large amount to Fort,
on a debt that she has always denied owing, and that the mort-
gaged premises should be sold under this judgment and bid off
by Fort, who was then to divide the same between the lawyers,
Fort, and Mrs. Speights—the same person who was so ready to
leave the safety of her home in the city of Augusta and come

to Lexington, for the purpose, as she now says, of testifying falsely in the former case of Fort. This arrangement was reduced to the form of a written agreement, which was claimed to have been lost, but its contents were extracted from W. G. Speights (the husband of Mrs. Speights above referred to) and J. C. Fort, on their cross-examination. It is impossible to read the testimony of these two witnesses without being impressed with the conviction that such was the arrangement between them. In pursuance thereof, it appears that the land was sold and bid off by Fort for a nominal sum, and that he is now in possession thereof, claiming it as his own. In order to perfect this scheme, concocted between W. G. Speights, acting for his wife, and Fort, it was necessary to overthow the Polly C. Meetze mortgage, as that was a senior lien on the land, and this may, possibly, account for the extraordinary change in the testimony of the most material witnesses in the present case. Without pursuing further investigation of the testimony in the case, all of which has been most carefully examined, it is sufficient for us to say that we are satisfied that Judge Benet has correctly solved the material question in the case, and that we concur in the conclusion which he has reached.

The judgment of this court is, that the judgment of Judge Fraser, as well as that of Judge Benet, be affirmed, and that the case be remanded to the Circuit Court for such further proceedings as may be deemed necessary.